Good morning, everyone. It is a little unusual to have you here virtually as opposed to in person, but we managed to do this quite successfully yesterday. I want to assure all the lawyers that if there does happen to be a technological problem, we will solve it and that will not count against your argument time. But I think everything should go quite smoothly. And you and Judge David Hamilton. So we are ready now to hear argument in our first case for today, which is number 192580 Siddique against Dr. Michael Laliberte and others. So we will hear from Mr. Grass first. Thank you, Your Honor. Good morning. And I'd like to thank the court for entertaining the hearing under these exceptional circumstances and extend my virtual handshake to the opposing counsel. May it please the court, my name is Gary Grass. I do represent the plaintiff appellate, Samir Siddique. How do you the application of qualified immunity in this case seems nearly nonsensical. The purpose of the doctrine of qualified immunity is you want government officials to follow the law and not do bad things, but you also don't want fear of a lawsuit to make them so passive in their use of discretion that they fail to do the important things that need to be done. So we have this doctrine that balances these two things implicitly that in every case, we're going to have a plaintiff opposing the bad things that he or she says was done. And the defendant is going to have some good thing that they were aiming for, which they say needs to be protected. Now, in our case, we know what the good, what the bad thing was, because, you know, Siddique, I think, pled very clearly, you know, the defendant's abuse of positions to restrain student speech and punish Mr. Siddique for the things that he had said and things that he had advocated by blocking him from obtaining an important student government position. So can I just ask Mr. Grass, excuse me, this is Judge Wood. The focus that we have at this point in this litigation is Mr. Siddique's interest in serving as a member of the Interim Board of Trustees. Is that correct? Certainly one of the important issues in this case would be the importance of that position and the value of that position. As we evaluate things, one of the important issues would be, you know, there are three elements, obviously, of the retaliation claim. The first two elements are things that, under a qualified immunity doctrine, really don't come into play because they're going to be essentially the same in every case. The person was denied a benefit and the reason for denying the benefit, you know, is substantially related to the protected extension. The third issue that needs to be proven is a sort of subtle one, which is whether that right that he was denied or that benefit that he was denied is of such importance or such value that people being denied that would result in a chilling of speech. And that's probably going to go on one issue that has enough subtlety in it that you could argue that whether or not this was clearly established or not. You know, in terms of the other facts, we don't really think that there needs to be any close similarity. We think that, you know, let me kind of make the comparison. If you have an excessive force case, a police officer shoots someone, we know that the courts have said that that is a circumstance where things are so dynamic and so complex that really every fact in that case matters. And that it's really, really hard to find a case that's directly on point. And usually the officer will find themselves with qualified immunity because they won't be able to find a case that's directly on point. Right. So could I could I ask, I mean, I understand that you're drawing that distinction. But in this instance, we're dealing with the relationship between the university administrators and people who are at least interested, as Mr. Siddiq was, in serving on the various student governance organizations, as it happens in this somewhat unusual time, the Board of Trustees. But don't we need some clearly established law about what degree of authority the university bureaucracy had, the that thing? And that was where the district judge thought that at that level of specificity, that there really wasn't as much guidance as I believe you are arguing there was. And I do agree with you, by the way, that we need to accept the facts as Mr. Siddiq presents them. So I think we do need to accept that Mr. Stockton was not consistent in his application of the enrollment criterion, at least for present purposes. So but I think the district judge did that, too. And so I want to know why a university official wouldn't have known that the way he was evaluating eligibility was automatically a violation of the First Amendment. Well, I think that, you know, it kind of breaks down into two sides of this. In terms of whether the law was clearly established, I'm not sure that relationship is really all that relevant. The factors or the retaliation include that the person acted to restrict the benefit that is for this illogical reason, and that the benefit was of a certain value. It really doesn't matter what the relationship was between the person who's engaged in the retaliation and the person that denied the benefit. That's not part of the test that applied for retaliation cases. So it really couldn't really produce a meaningful distinction, you know, regardless of whether, you know, he was the direct employee of Mr. Stockton or the employee of the Student Association. That relationship isn't really important here. So you're saying it's not important that it was a state benefit that he was, are you saying it's not important that it was a state benefit that he was allegedly depriving Mr. Siddiq of and in retaliation for Mr. Siddiq's speech? Well, no, it's important that it's a state benefit. But the particular relationship between the bad actor and that, and the person that's denied the benefit is not fundamentally part of what the action is about. And so it really can't give rise to a meaningful distinction. In terms of whether, yeah. Judge Hamilton, maybe I could get at this question from a slightly different angle. Your argument seems to rely pretty heavily on the public employment analogy. And yet, if we follow that path, it seems that we wind up following into doctrines that you then want to disavow. You don't want to get into the conic pickering balancing test. You describe the role of the student trustees as so important that in any other governmental setting, you would clearly be treated as a policymaking or public or confidential position such that dismissal or denial would be permitted on political grounds. And so I'm wondering how, in essence, how you can take advantage of public employment analogies, and yet disclaim the more bitter doctrines that would seem to point against recovery in this case? Well, I guess the first thing I'd point out is that, you know, both sides agree that there's no conic pickering issue in this case. The defense didn't raise it, but it's got more and that's got more than... Mr. Grass, I'm trying to understand how the law might be clearly established in this case, given the rather ambiguous status in which you want to embrace some parts of public employment law, and then disavow others. Well, I think what's relevant from public employment law is the fact that the position is something that has sufficient value that it meets that third element of the test for retaliation. With respect to some of the other and the employer then has a conic pickering, they have a right to direct their employees. In this case, the university was not Mr. Siddiq Brinkman's employer. The board of trustees would have been his employer had he not been ruled out before he got to make that application. And so there was no interest on the part of Mr. Stockton or something like conic pickering in saying, look, this is a balancing test that is designed to protect the employer's benefit. They weren't the employer, so they can't really use that. And again, Mr. Grass, you cited Elrod. And I don't know how familiar you are with the broader line of Elrod Branty cases that the Seventh Circuit has applied many, many times. This is a policymaking position, right? It would have been a policymaking position. It would have been a job to represent students on behalf of the students. And of course, that is something that is completely distinct. And there's supposed to be a board of trustees and the students that you would be representing. And on the other side of that, the administration, which is not supposed to interfere at all with the student government or particularly its election personnel. Would it violate the Constitution if the administration published an op-ed in the university newspaper endorsing one slate or opposing another slate in normal student elections? I don't think it would. I think it would arguably violate the state law regarding interference with student government. But I don't see that that could be the source of a retaliation claim. Here, it wasn't simply an attempt to simply put this person's name out of the basket. And that, I think, is completely distinct from, you know, something, you know, in which they're just using expensive activity to try to convince someone to do something. But you do concede that there are some reasons that they could have taken his name out of the basket. I mean, suppose they had said, you know, we're not going to let people with a grade point average below 2.0 to serve in our educational mission. Would that be okay? Well, in this case, it is still issued that because... I know what it was in this case. But I'm asking you, you know, looking at this Wisconsin statute, which you correctly say is not the measure of the First Amendment, but still somewhere in the background, there are powers that the board has over the student government process. For example, it has responsibility, final confirmation for the way they want to dispose of fees. So I'm just wondering whether your position is a very firm one that there's absolutely no say that the university board and its organs might have over the student government participants, or whether there are some things, but just this one was wrong. Well, you know, I was actually thinking about that, you know, this morning and frequently, actually. And I think it really is absolute in practice. If you go into bomb, you could make a theoretical argument. If you could find some board power or some chancellor power, that was very specific, that dictated a certain result in a certain case where they could come in and interfere with the student government. And that you could say, well, that power no longer is more, no longer more general and less specific than the student rights that are given in the statute. And, you know, you could really, I think you make an argument that it doesn't apply that this, this right of students to non-interference really isn't absolute, but I can't for the life of me, think of any practical circumstances or any actual provision in the statute that would apply to actually do that. As far as I can see, this really is an absolute wall. I don't see anything in the statute that I can think of conceivably ever would give them the power to dictate who's in the student government and who isn't. I don't think the 2.0 rule is something that they can enforce against the student government. And I think if you actually look at their policy, I think their policy acknowledges that implicitly because it doesn't really apply that against the student government. It applies that against student organizations, but it doesn't apply it against the student government body itself. Actually, am I out of time now? You're not. I was going to tell you, you wanted two minutes for rebuttal. Is that correct? Yeah. So I'll tell you when it's at two minutes. You're at five minutes, 31 seconds now. Mr. Gratz, if I could then ask you a question. This is Hamilton again. And I, to put the matter rather bluntly, if I could. Sadiq's theory is that it's perfectly fine for him to work to get Mr. Stockton fired or his position defunded, but it violates the constitution for Stockton to fight back when he's seeking a position in student government. It would help him do that. Well, yeah, I don't see anything in the law that says students can't speak out against administrators. I do see something in the law. But speaking out can have political consequences. That goes back. I mean, there's a sense here in which Mr. Sadiq's case seems to be saying he can dish it out. He's constitutionally entitled to dish it out, but he's protected from response. I think I've already said, I don't see a problem if Mr. Stockton had run an op-ed against Mr. Sadiq and said that students shouldn't vote for him. That would be a different issue. If it was first amendment expression competing against first amendment, I think those are both protected and I don't see any problem with that. On the other hand, what you had here again was not first amendment protected expression. It was just simply Mr. Stockton pulling that name out of the basket and just by brute force, just determining the result. Can I ask you one factual question here? Who, as you understand it, actually made the selection of the final 50 board members for this interim board? Oh, I believe that decision was ultimately made by the student court. They may have made it with the participation of Mr. Stockton, which I don't think would have been legal, but I don't know for a fact whether he was involved in that part or not. I know that he was involved in taking the name out of the basket. And what would be... Oh, go ahead. Sorry. Well, I was just going to ask, when you say the court, you're speaking about the student body? Yeah, the student court made that decision. So it was by a vote? I have no idea what their internal processes were. They just stated that they would make the final selection based. They were taking the applicants and they were making the final decision as they were the only remnant of the old student government that still existed. And so they were exercising their authority. They did indicate in some of their orders that they would be acting in consultation with the chancellor or with some sort of guidance by the administration, which I think is telling that they were, in some sense, acting as the cat's paw of the administration at that point. But that's kind of secondary to what we're arguing here. Basically, just against these two individual administrators who have... All right, Mr. Grass, I'm going to interrupt and tell you you're at your two-minute mark, if you would like to reserve your time. Okay, I will do so. Thank you. All right. Thank you very much, then. We are now then ready to hear from Mr. Murphy for the appellees. Mr. Murphy, are you here? Yes, I am here. Thank you. And may it please the court, my name is Mike Murphy. I represent the defendants' FLEs in this case. This is a qualified immunity case where Mr. Sadiq is required to identify clearly established analogous law putting officials on first amendment violation. He has not come close to that, either here or in district court. Indeed, his district court brief did not identify a single first amendment case. Here, as we discussed this morning, he relies primarily on employment law cases. Those are fundamentally different for the reasons raised by Judge Hamilton, but it's also not as though there is not a body of case law addressing first amendment student and campus issues. So, Mr. Murphy, could I ask you, Mr. Murphy, one thing about your brief that concerned me is that it seemed to rely on a disputed interpretation of the facts. So, you say many times over in your brief that the reason Mr. Sadiq was not in the pool of candidates for the Board of Trustees is because he was not at that moment enrolled and didn't become enrolled until August when he paid his fees. And there was some evidence in the record to suggest that at least one other student was in a similar position, disputed to be sure, but other evidence did seem to exist. So, I think we need to proceed as though Mr. Stockton deliberately pulled Mr. Sadiq's name out of the pool and didn't allow him to go forward for this position and ask whether that kind of action, retaliating against objections to Mr. Sadiq's speech, is permissible. And so I wonder, for example, whether you would think it was permissible if Mr. Stockton had said, you know, Mr. Sadiq has urged that, you know, the state of Wisconsin secede from the union or some such thing, some very unpopular political point of view. Could he pull him out of the pool for that reason? Your Honor, a few points in response to that. As we argued in our brief, we think that this case could be affirmed under the first prong and that the crudely named affidavit does not raise a genuine issue of disputed facts. I will not dwell on that because I think it's not the question that you asked, but we do want to make the point that we do not believe there is a genuine issue of material fact and the first prong of qualified immunity could carry this. As to the question of what about presuming that there was some unpopular speech, um, that's just not, that just doesn't carry the day on a qualified immunity analysis. I understand Mr. Sadiq and opposing counsel's argument to be that the clearly established prong is satisfied just on the most basic standards and elements of a First Amendment violation. And of course, what qualified immunity requires is a reasonably analogous law showing a clearly established violation. As Davis has said, even defendants who violate constitutional rights enjoy the qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standards. What I think Mr. Sadiq's brief and argument on that line is attempting to do is write the qualified immunity analysis completely out of this case and go straight to like a pleading face merits argument. And what he was required to do here is identify clearly established and reasonably analogous law, putting officials on notice of a First Amendment violation and he comes nowhere close to that. He instead argued primarily about state law violations. These are the same alleged violations that have been dismissed in three cases over the six years since the underlying event. So could I ask, is your position, I'm sorry for the interrupting, but it's a little bit hard. Is it your position then that the lack of clarity for that second part of qualified immunity comes about because of the relationship between university administrators and students and the fact that there are many iterations of that relationship that could exist? So Mr. Stockton, I'm just asking whether this is your argument, that Mr. Stockton wouldn't have known that he couldn't exercise this much control over who's in the pool? That is correct, but it's not all of our argument on that point. For all the reasons that the district court stated, it is correct that 36.09, Wisconsin Statute 36.09 in the bottom line of cases did not create a clearly established right. But beyond that, that is just the state law element of the analysis. And again, as the U.S. Supreme Court in Davis made very clear, quoting directly from the decision, officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provisions. Mr. Sadiq is required to identify clearly established first amendment law. And he does not come even close to that and doesn't really even seriously engage in the issue. And it's not for lack of existing. Just by general awareness of first amendment jurisprudence, there is, for example, cases like Tinker v. Des Moines, the landmark first amendment case permitting expulsion of a student for speech made at a student assembly. What became very popular in popular media, the Morris v. Frederick case involving the Jesus banner, and going back a little bit before that was Tinker v. Des Moines, involving wearing black armbands and protests of the Vietnam War. What Sadiq has to show here is reasonably analogous first amendment law showing that there is a violation of a clearly established right. And he's not even really engaged that issue whatsoever. And certainly has not come close to meeting his burden under the qualified immunity standards. If I could follow up on that a little bit. I think that you would agree that it would violate well established first amendment law for a university to say, let's say libertarians are going to be denied access to university housing. That does seem plain, yes. That would be pretty clear, right? And I guess what I want to focus on is the difference between what I will just call ordinary life as a student, and the ordinary incidents of of student life and academic work, and student governance. I understood your position to be that that would be pretty important, that as Judge Wood was asking, it really is the rather unusual relationship between administration and student governance that would contribute to whatever constitutional fog or uncertainty would support qualified immunity defense in this case. Yes, I would agree with that. And the district court's analysis and its reading of VOM does support, does engage that issue, and helps to show why qualified immunity was entirely important here. And I just think additionally that the reliance on labor law alone and not engagement of any first amendment law addressing the relationship you just described, not engaging that issue whatsoever, necessarily means the state is not at his burden to overcome qualified immunity. Much of City's argument on appeal is on this, the idea that qualified immunity depends on the scope of discretion of a person's employment. That argument is substantively wrong and also defeats his merits argument. There's no discretion element of qualified immunity of the type that City advocates. Qualified immunity gives official breathing to their job and protects all but the clearly incompetent of those who not only violate the law. It does not depend on job-related discretion. Excuse me, Mr. Murphy, what if there had been a long line of cases from the Supreme Court of Wisconsin construed, I know there hasn't been a long line, but what if there were a long line construing 36.095 and particularly the last sentence of that statutory provision, and they all said students have an absolutely unqualified right to select their representatives to participate in institutional governance. They can allow former students, they can allow students with terrible grade point averages, they can allow troublemakers, they can allow anybody they want. And Mr. Stockton just flouted that because he didn't like what Mr. Sadiq's speech and positions had been vis-a-vis, I mean, Sadiq's trying to get rid of his job, right? So there are different aspects of this. I'm trying to explore to what extent the content of state law helps inform our understanding of the clearly established First Amendment rule. Yeah, the remedy in that situation is that the university would have violated state law and the state law claim would have prevailed, the same state law claim that has been dismissed from three lawsuits in this case. From the First Amendment, I do not believe that alone would overcome qualified immunity on the First Amendment. I really think that Davis v. Shurer is quite informative on this point. That was a case about a police officer being terminated for having a second job, and he brought a 14th Amendment due process violation. One of the arguments that he made is that the police department did not follow the state law procedures for terminating him from employment. And the U.S. Supreme Court found that state law violation to be not sufficient to show a 14th Amendment violation. This is that same quote where officials sued for constitutional violations do not lose their statutory or administrative provision. What if the consequences of the state law violation are the sort of thing that would cause a person of ordinary firmness to refrain from exercising his or her First Amendment rights? That's the First Amendment test, and that's what Mr. Grass was talking about. And he was saying that this measure that Stockton took to pull Sadiq's name out of the pool of people for the Board of Trustees was in fact something that could have that chilling effect on a normal person. That would be relevant for a First Amendment merits analysis. But I still think that to overcome qualified immunity, there would still have to be some connection between clearly established law and the official conduct. So, I mean, a most direct answer to your question is that, yes, that would be relevant in a First Amendment analysis. But the important thing about qualified immunity is to give the officials the breathing room and do what it's meant to do, protect all those who are clearly incompetent and those who knowingly violate the law. There would still need to be some connection between a clearly established right and the official conduct. It's a little hard to answer that in the abstract, but I think your question goes to something that would be highly relevant in a First Amendment analysis. It would not on its own overcome qualified immunity. Okay. And I'm more than happy to continue that or move back to the discretion argument that's made, which is just to the point that qualified immunity does not depend on broad job-related discretion. We're familiar with the way qualified immunity has evolved in recent decades since the case. Can I ask you just one quick question about the record, Mr. Murphy? I believe there's in the record an audio recording of a May 6th, 2013 meeting. I think the district judge cited it in his opinion. And is there any issue as far as you're concerned about the authenticity or the availability of that recording in the summary judgment record? There are. I regretfully have to concede that I'm not familiar with that particular point in the record, the audio. Oh, just to clear something out. I do not remember the content of it specifically, but I do just in this moment recall that there was evidence of things that was introduced by a person who was at the meeting, but not a person who was a speaker. And we did raise below that that would be inadmissible hearsay. So, we did have a concern on numerous points of the record about hearsay. I do not remember the content of that particular recording well enough to give a better answer than that, and I apologize. Well, I assume that the recording itself would not be hearsay unless it were being offered as proof of the content of a statement being made by a speaker. But if the speakers are expressing their own states of mind, their opinions, for example, about different candidates and so on, I would think that that would be admissible without a hearsay objection. It's not offered for the truth of the matter, sir. It would be. And I do regret that I'm not as prepared as I could be on that particular point in the record. I don't recall. It's a detail. It's a detail. Not to worry. Okay. What would happen in a regular student election if a question were to arise about a candidate's eligibility because of, let's say, grade point average or enrollment status, where we've got these privacy implications at stake? In essence, what most of us would call a good old-fashioned election contest about the eligibility of a candidate. And it's student governance, but there are privacy issues involved. How is that resolved? So the privacy issue here, make sure I understand the question. The privacy issue here is that it was Stockton and not a student who reviewed applications for eligibility because we don't want students knowing each other's things like grade point average and enrollment status. And if the question is, if that happened outside of this unusual circumstance, how would that be resolved? I do not know the answer as a matter of university procedure. I just don't know. I can tell you that in general, most issues like that are resolved by the student court, but I'm not aware of that ever having come up. Not to say it hasn't. I'm just not aware of it. And I don't know as a matter of student court procedure how that would be resolved. Okay. Thanks. Lastly, we do believe that this case could be affirmed under the first prong of the qualified analysis, which is whether a constitutional violation occurred in the first place. And a critical distinction to be made is what the case and the decision before the court is not about. It's not about anything that the chancellor did or non-recognition of the prior student government or the independent outside review, which panel are not defendants, the student court decision to create a board of trustees or the new government. Now, the issue turns on just a few really, and none of them which were materially disputed. Stockton was ordered by the student court to coordinate an application process after the student court ordered the creation of the board of trustees. One requirement was enrollment. Sadiq was not enrolled and Stockton did exactly what his job required. In fact, in the words of Mr. Sadiq, applied the criteria in the same way that a computer algorithm would. Could I just interrupt you, Mr. Murphy, and say that you're in your last minute? Yes. In closing and conclusion here, Mr. Sadiq here was required to identify clearly established first amendment law that could overcome qualified immunity. He failed to do that. And for that request, the district court decision be affirmed. All right. Thank you very much. So you had approximately two minutes, Mr. Grass, for your rebuttal. All right. Thank you. Obviously, I'll have to move into very few points. Before you start, could I ask you though, I'm concerned about who's really still in this case. And your brief doesn't say anything in particular about Thomas. And I'm wondering whether you have anything other than effectively responding its superior arguments for LaLiberte. Stockton, I understand, is the focus. Is that correct? Right. Right. And Thomas, we do is out of it now. We're not appealing the portion of the decision that we made to Thomas. Okay. And we do have more than we found that material for LaLiberte. I think LaLiberte was behind this whole action. I think the evidence for it is not as strong as we have with Stockton, but it's certainly there. Particularly that one meeting that there was no hearsay. LaLiberte is basically at that meeting in the recording saying that he wanted people who were antagonistic towards the administration to be kept out of the student government. And he was showing that he had that fundamental same motive. And he was the direct superior of Stockton acting on his behalf. LaLiberte motivated or affirmed that decision that Stockton made to do this. I think that maybe the evidence isn't quite as strong, but I think it's definitely enough to satisfy somebody's judgment standard. Mr. Graf, what are Mr. Sadiq's damages? Mr. Sadiq's damages are primarily just for the loss of his basic first amendment rights. He did lose a potential of up to $14,000 in salary from this position and some incalculable amount because of the... Pardon me? Did you say $14,000? Yeah, $14,000 was roughly what he could have made from this position. And then there was obviously a lot more... Just a temporary board of trustees? It doesn't matter. Are you kidding? For a five or six month gig as one of them, a member of the 50 member board? Well, it wasn't obviously after a five month gig because the body had the power to extend its own term so that it stayed there for a year. And it set its own salary. So the top eight members of that body, if they had stood for four years, would have gotten roughly $14,000, $15,000. These are students making $14,000 for this position? I think we have evidence to show some made at least half of that. And we calculated the potential amount from that position to be $14,000. I don't know for a fact that we have anyone that the top position wound up not being held by one person throughout the entire year. They killed off the chair of the board for reasons that, again, I think were in violation of his First Amendment rights. And so they wound up having a couple of different people in the top spot. Okay. Mr. Grass, you're going to have to wrap up now because we're about a minute and a half over time. Okay. Can I make it just two minutes? Oh, you've already taken double your two minutes, but how about one sentence? One sentence. It's hard to pick which one of the two sentences. Let me say that in a case like Tinker Boys v. Des Moines, which the other side cited, there was actually a competing interest that they could identify which justified taking away or limiting someone's First Amendment rights. Whereas in this case, we don't, we still don't know what it was that the university thought they were doing that was good that these qualified immunity protections. As far as Bob is concerned, this entire scope and field of activity was off limits to them in the first place. There was nothing that they could do within their realm of authority that made any sense that would be a good thing for qualified immunity to protect. Okay. I think we're going to have to, we're going to have to leave it there, but we of course have your briefs and we thank both you and Mr. Murphy for participating in these arguments by audio. It's very helpful to society, the court, et cetera. So the case will be taken under advisement.